(C. D. 670)

AMERICAN SMELTING & REFINING CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 22, 1942)

*B. A. McKenzie; Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence*, of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Francis X. O'Donnell, Jr., Richard F. Weeks*, and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges; TILSON, J., and KINCHELOE, J., concurring in the conclusion only

DALLINGER, Judge: This is a suit against the United States, arising at the port of Tacoma, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation invoiced as "brass residues." It was classified by the collector as entitled to free entry under the following paragraph of the Tariff Act of 1930:

PAR. 1634. Brass, old brass, clippings from brass or Dutch metal, all the foregoing, fit only for remanufacture.

However, the collector did impose a tax of 4 cents per pound on the copper contained therein under section 601 (c) (7) of the Revenue Act of 1932, the pertinent provision of which reads:

Copper-bearing ores and concentrates and articles provided for in paragraph 316, 380, 381, 387, 1620, 1634, 1657, 1658, or 1659 of the tariff act of 1930, 4 cents per pound on the copper contained therein.

It is claimed that said merchandise is properly classifiable under paragraph 1664 of said tariff act, and therefore not subject to any

copper tax under the Revenue Act of 1932. Said paragraph 1664 reads:

Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

At the hearing in this case held at Tacoma, Wash., on November 14, 1941, the plaintiff offered in evidence the testimony of three witnesses. The first, John A. Rea, Jr., customs storekeeper at the customs bonded warehouse at Tacoma Smelters, identified a representative sample of the merchandise at bar labeled "Lot 1397," which was admitted in evidence as plaintiff's exhibit 1.

The second plaintiff's witness, Albert H. Mellish, a qualified chemist, testified that as chief chemist he had supervision of all the assays and chemical analyses made in the laboratory at the Tacoma Smelters; that some of the material from "Lot 1397" herein imported by the American Smelting & Refining Co. was analyzed under his supervision; and that said analysis shows that a ton of material contained the following:

| | *Percent.* | | *Percent.* |
|---|---|---|---|
| Copper | 55.93 | Nickel | .33 |
| Zinc | 14.87 | Antimony | .40 |
| Lead | 4.04 | Silver | .01 |
| Arsenic | .59 | Gold | .0003 |

The witness then proceeded to testify in part as follows:

Q. I will ask you to examine Exhibit 1 please, both with the naked eye, and with the use of this magnifying glass, and please describe what you have seen both by the use of the naked eye, and by the use of the magnifying glass.—A. I have seen rounded particles and particles of very irregular shape. I also find very small particles of what appears to be sand, and some particles of wire. I believe I see a nail here, I am not sure, or a piece of a nail.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

Q. You referred to rounded particles and particles of irregular shapes. What were those particles, what is their identity?—A. The rounded particles appear to be metal, also the large particles of irregular shape.

Q. Have you seen brass being cast?—A. Yes, I have.

Q. Are you familiar with the product. if such a product does exist, which is obtained as sweepings from a brass foundry?—A. I have seen material on the floor of a brass foundry.

Q. Will you tell us what the material as represented by Exhibit 1 is, in your opinion Mr. Mellish?

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

The WITNESS. My opinion is that is the residue from a brass foundry.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

By Mr. TUTTLE:

Q. Is that material in your opinion old brass?—A. No.

Q. Is it clippings from brass or Dutch metal?—A. No.

Q. Is it any of these substances, brass, old brass, clippings from brass or Dutch metal, fit only for remanufacture?—A. No, I would say it is a brass foundry residue or a foundry residue.

·Q. Is the material as represented by Exhibit 1, a metallic mineral substance?—A. Yes, sir.

On cross-examination the witness testified in part as follows:

X Q. Isn't it a fact that the ratio between lead and zinc is rather high in this material, that is 4 percent as compared to 14 percent?—A. Not necessarily.

X Q. Would you mind explaining the percentage of nickel in this material, Exhibit 1?—A. It probably came from the same source. There is a possibility, an extreme probability, of there being scrap in that charge and there are some alloys which carry nickel included and those alloys are subsequently put into the charge of a brass foundry. Accordingly, there will be nickel and all the rest of the by-products in that material.

    \*      \*      \*      \*      \*      \*      \*

X Q. Well how do you account for the presence of gold and silver in a charge for brass?—A. I believe that I covered that in my previous testimony to the effect that the copper that is used in a brass foundry is not always electrolytically refined, that is 99.9 percent copper. In some cases they use copper that is electrolytically refined, but in the other cases it is very possible to have a small amount of gold and silver in it and the same is true of other metals,  \*  \*  \*.

X Q. Is it likely that a charge will have all of the elements contained in this material, Exhibit 1; that is gold, silver, nickel, antimony, all at once in a single charge?—A. In a scrap that goes to a foundry, you are liable to find anything.

    \*      \*      \*      \*      \*      \*      \*

X Q. What is the basis of your knowledge? You say you never manufactured brass, and you cannot recall a single brass foundry that you visited in the United States?—A. That is true.

X Q. Well what is the basis of your statement with respect to these various substances?—A. Technical literature, perhaps.

    \*      \*      \*      \*      \*      \*      \*

Judge DALLINGER. Mr. Witness, regardless of whether you ever worked in a brass foundry, but from looking at that material with both the naked eye, and with the magnifying glass, would you say from its appearance and the presence of old nails, pieces of wood, and the fact it adhered to your hand, would you still say, regardless of whether you worked in a brass foundry, that it is brass foundry ash?

The WITNESS. I say it is foundry residue.

On redirect examination the witness testified in part as follows:

R. Q. In connection with your work as chief chemist for the American Smelting and Refining Company, and your studies in metallurgy, have you become familiar with the processes by which brass is manufactured, the various processes?—A. Yes.

    \*      \*      \*      \*      \*      \*      \*

Mr. TUTTLE. The issue here is whether or not the merchandise should be classified under Paragraph 1664, which provides for metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for. This witness has stated that it was a metallic mineral substance, and I think that he has established that it is in a crude state.

    \*      \*      \*      \*      \*      \*      \*

The WITNESS. Yes.

    \*      \*      \*      \*      \*      \*      \*

Q. Can those various forms or types of brass have in them different quantities of gold or silver or lead or zinc or copper or nickel, or arsenic or antimony?—A. Yes, they can.

Q. They can all vary, can they?—A. Yes, sir.

The plaintiff's third witness, Earl R. Marble, a qualified chemical engineer and general superintendent of the Tacoma Smelters, testified that the latter was a unit of the American Smelting & Refining Co.; that at times his smelter processes brass and ships it to another unit of the American Smelting & Refining Co. known as Federated Metals, Incorporated, located at Seattle. The witness then applied a small 10- or 15-cent magnet to exhibit 1, as a result of which experiment he testified that said material contained magnetic particles. He then testified in part as follows:

Q. Mr. Marble, I want to ask you whether the contents of that bag marked Exhibit 1, is in your opinion, brass?—A. It is not brass in the sense it is not brass entirely. Brass is a homogeneous metal.

Q. Therefore, I take it there is some brass present?—A. There is some brass present.

Q. Is the contents of that bag, that is the whole thing, in your opinion, old brass?—A. No.

Q. Is it clippings from brass or Dutch metal?—A. No.

Q. Is it either brass, old brass, clippings from brass or Dutch metal fit only for remanufacture?—A. No.

Q. What is it?—A. I would call it a brass foundry residue.

Q. Why do you say that?—A. Because it is the class of material you would expect to be cleaned and swept up from the floor of a brass foundry and such material as is worth while shipping to a smelting plant for treatment and recovery of such valuable materials.

Q. You say this is a brass foundry residue. Will you tell us why and include in that answer your description of the manner or the method by which such substance is made or is obtained?—A. A brass foundry in the casting of objects made of brass requires that molds be used to make the necessary form of the brass article made. Those molds consists of a drag and a cope, in other words two halves of the mold, and a wooden pattern or at least generally a wooden pattern is used, which is the form of the article to be made, that is placed in the mold and sand is placed around the wooden pattern and finally the two portions of the mold are pulled apart. The upper portion of the cope sometimes is too heavy, and in order to protect it nails are used. The brass itself can be molded either from virgin metal, new metal, or can be made from secondary metals. Many foundries buy scrap metal in obtaining the copper used in their charge. In the melting of this copper and zinc together, the zinc being more volatile, the more easily oxidized metal may in part be burned off or passed off in the air. In the molding of the brass there is also a scum formed on top of the molten metal, and this has to be removed before the brass can be drawn for casting. In the casting operation and after the molds are broken down, you will find there are various particles that contained metallic values which are commingled with the molding sand. The molding sand is sifted, and in the screening of that sand there are obtained certain metallic substances that have a sufficient value for use in a smelter. All the products that are obtained are metals of this character which are swept up and cleaned up or removed from the foundry floor.

Q. I take it then that this material Exhibit 1, is a metallic mineral substance?—A. It is.

Judge DALLINGER. Would you say it is a crude metallic mineral substance?
The WITNESS. It is.

\*      \*      \*      \*      \*      \*      \*

Q. In describing what you understood to be the process of casting brass, I believe you stated that brass could be obtained from either virgin metal or scrap metal?—A. Yes.

\* \* \* \* \* \* \*

Q. Does that scrap, that is the brass, vary in its content with the quantity of copper, the quantity of zinc or the quantity of any other metal which may be in that substance?—A. Yes, it depends on the ores, whatever type of brass that may be obtained.

Q. Will you give us the approximate range of copper which in your experience you have found in a brass?—A. The copper might be as low as 50 or 60 per cent, and the balance would be largely zinc, except for a small amount of other metals, which might be lead, nickel or arsenic or antimony, but in the case of brass you will find the largest part to be copper and zinc.

On cross-examination the witness testified in part as follows:

X Q. Is there a difference between a brass foundry ash and a brass foundry residue?—A. There is a technical difference that may assume large proportions in certain people's minds.

X Q. But I just asked you whether you recognize a difference between them?—A. Yes, I have naturally called this an ash because of the percentage of visible particles of zinc oxide that I find there.

X Q. How do you detect those visible particles of zinc oxide?—A. Zinc oxide unless it becomes entirely discolored is shown as whitish material which has no particular strength, and is usually rubbed off, unless it becomes commingled with the other metallic substances. You can distinguish here certain particles of that zinc oxide.

\* \* \* \* \* \* \*

X Q. And what did you say you observed in this material, Exhibit 1?—A. I said I observed particles of metal that appear as though they had been melted at some previous time; that there is sand here or what has the appearance of foundry sand; that there are pieces of copper wire, and a rather thick piece of copper tubing, and there are pieces of iron wire and an iron nail, which is similar to the coping nails used in foundry work and distributed throughout the mass in foundry sand.

X Q. That piece of copper tubing shows no sign of having been melted?—A. No.

X Q. Do you notice pieces of screws and so forth, which also show no sign of having been previously melted?—A. Yes.

Judge DALLINGER. How do you account for that in your experience?

The WITNESS. In the purchasing of scrap material you will find all sizes, Your Honor. There may be large pieces such as these parts of pipe, also pieces of copper wire and also parts of different products cut off that may have been used in some manufacturer's establishment, that of course when brought into the foundry, it is shovelled in the crucible or the furnace and a lot of the fine stuff dribbles down to the foundry floor and all of that is used in the scrap material for the making of brass.

At the conclusion of the plaintiff's evidence the following colloquy took place:

Mr. TUTTLE. Before the Government proceeds with their evidence, I would like to offer in evidence the consular invoice here, with particular reference to the notations here in red ink reading: "Brass residue" under which the initials "C. M. S." appear. I ask if the Government will stipulate that these initials

are the initials of Examiner Strony, who was the Examiner in this case? Are you willing to stipulate Mr. O'Donnell, that he is an inspector who at the time of arrival of this merchandise examined it, and that he had been designated as an Acting Examiner, and was acting in the capacity of Examiner, at that time?

Mr. O'DONNELL. We will so stipulate.

\*     \*     \*     \*     \*     \*     \*

The consular invoice referred to was then admitted in evidence as plaintiff's exhibit 2.

The Government offered in evidence the testimony of Ross G. LaMotte, Government assayer for the last 7½ years, who testified that he had been formerly in the employ of the Anaconda Copper Co. as a sampler of foundry products from the company's brass foundry; that in that capacity he had occasion to sample and analyze brass foundry ash every day for about 2 years. The witness then proceeded to testify in part as follows:

Q. Basing your answer on such experience, will you state whether you are able to recognize any given material from a visual examination of the same as a brass foundry ash or residue?—A. No, I cannot positively recognize a thing as brass.

\*     \*     \*     \*     \*     \*     \*

Q. How would you recognize a certain material or a particular mixture as not being a brass foundry ash or residue?—A. It would have enough outside material that I could definitely say it was not a brass foundry ash or residue, which would change the classification of the material.

Q. Are there any other things for which you would look to determine whether or not a particular mixture was or was not a brass foundry ash or residue?—A. A brass foundry ash usually contains material from the molds, the brass molds that come from the scraping of the molds, and which is generally embedded in the material, and when the sand present in metallics is not to some degree embedded in them, I would say it is not generally a product of a brass foundry.

Q. Would you expect to find a proportion of zinc oxide in brass foundry ash or residue?—A. Yes, I would.

The witness was then asked to examine exhibit 1, and continued to testify in part as follows:

Q. Is that brass foundry ash, or residue?—A. No it has not the appearance of brass foundry ash.

Q. Is it a brass foundry residue?—A. It could possibly be a residue, but it might be a number of other things.

\*     \*     \*     \*     \*     \*     \*

Q. Assuming the analysis of a given commodity shows .9 ounce of gold; 3.29 ounces of silver, those figures are per ton; 4.04 per cent lead; 55.93 per cent copper; 14.83 per cent zinc; .33 per cent nickel; .59 per cent arsenic, and .48 per cent antimony, would you say such a commodity having such chemical constituents is a brass foundry ash?—A. Definitely no.

Q. Would you mind explaining your answer, please?—A. Well in any analysis of brass that I have made or seen or heard of, there was never that much gold or silver or antimony or for that matter nickel. Also the analysis points to something else than brass ash or brass residue.

Q. How about the percentage of lead?—A. The percentage of lead is too high, and the lead gets into brass through the zinc. We have a smelter that carries

about 1 per cent of lead, and in making a pure grade, they might use in that smelter about one-half per cent of lead, but never as much as 4 per cent, and the ratio would never be as high as 20 per cent of lead to 80 per cent of zinc as it is in this case. It never is that high in brass residue or in anything connected with a brass foundry.

Q. Did I understand you to say that the presence of lead is undesirable?—A. Yes, lead is undesirable in excess of approximately one-half per cent.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Judge DALLINGER. Would you consider it to be a residue of any kind?

The WITNESS. Well that is a very difficult question. It could be a byproduct of a magnetic separation material that was not sized properly and which dropped off the belt due to its weight, and generally in a magnetic separation, the material is properly sized. I think this may have been taken off the screens, probably the trammel screens, and did not go into the magnetic separator.

Judge DALLINGER. You have not answered my question. In no instance would you consider that material you examined, a residue, is that right?

The WITNESS. There are various kinds of residues.

Judge DALLINGER. Would it be any kind of a residue?

The WITNESS. Yes, if it did not have that excess of copper wire and other materials that are in there, in their original form. It might easily have been considered as a residue of some smelting operation, but the fact that it carries a considerable amount of unsmelted material indicates to me, that it is not a brass foundry product.

Judge DALLINGER. Would you consider it a crude mineral substance?

The WITNESS. No. It has been, or at least some of it has been subjected to a smelting operation.

## On cross-examination the witness testified in part as follows:

X Q. You have told us Mr. LaMotte, that you have examined and analyzed brass foundry ashes and residues; I believe I am quoting you. Have you found any difference between those two products, first as to your examinations, then as to your analyses?—A. Between the ash and the residue?

X Q. Yes?—A. Well the ash of course generally contains some zinc and the residue is the pot skimmings from the smelting operation, and it contains some metal, some large pieces, and there is a general difference in appearance.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. What I want to make clear so the court will understand is whether what you have told us is a residue, is any kind of material that you referred to as the "pot skimmings"?—A. Yes.

X Q. Is that all a residue consists of to your knowledge?—A. Well generally yes, because the sweepings are kept separately.

X Q. In other words you do not include in your definition of a residue any substance or material that may be found on the floor of a brass foundry?—A. No, not in normal practice.

X Q. You do not yourself?—A. No.

X Q. I want your own experience?—A. No, I do not.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. In the brass foundries where you have observed the brasses, what materials did they use?—A. We used straight ingot material.

X Q. That was the brass foundry of what company?—A. That was the brass foundry of the Anaconda Copper Company.

X Q. Was that the only brass foundry where you observed the brasses?—A. That is the single one.

X Q. Were those ingots made from virgin material or raw copper?—A. They were made from virgin material.

X Q. Are your answers in this case as to the percentage of gold, silver or lead which you believe should exist in brass foundry ashes or residues, based on your experience with that Anaconda Copper Company?—A. Yes, it is.

X Q. And it is limited then, I take it, to your experience in using ingots rather than in using or observing the use of scrap material?—A. It is limited to the brass that we bought.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. Do you know what old brass is?—A. Yes.

X Q. Does that contain lead?—A. Yes, it contains lead and tin.

X Q. In what percentage is the lead there?—A. I would say the lead would not go over 10 per cent, and the tin not over 4 per cent.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. Do you know of any copper which contains silver?—A. Yes.

X Q. What is the name of it?—A. Lake Superior copper, all contains silver.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. I want to refer back to your experience with the Anaconda Copper Company, and to the ingots you were using, had they been previously refined copper?—A. Yes, it had been electrolytically refined.

X Q. What was the effect of that so far as removing other metals?—A. It removed the arsenic, antimony, and including the catalyst's gold and silver.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. I think it was in response to one of the questions by the court as to whether or not this could be a residue, and you gave your opinion that a residue means a product that has been smelted. That is your opinion; am I correct in that?—A. Yes. In retorting zinc you get a product something like this in analysis, that has lead and copper and various other things but when it is led into the retort they break that out and sell it as residue.

X Q. And also in response to one of the court's questions where Judge Dallinger wishes to know whether this is a metallic mineral substance in a crude state, you gave him some statement to the effect that it was not in a crude state because some portions of the exhibit had been manufactured; is that right?—A. And the material showed it had been resmelted and oxidized, some of it.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. Let me ask you so we will understand each other in this matter: Is a brass foundry residue or a product which you recognize as a brass foundry residue, or as a residue, or either one of those two things, in your opinion crude?—A. No, it is secondary, it has been smelted.

X Q. Do you know what drosses are?—A. Yes.

X Q. What is that?—A. It is a material that collects on the top of the furnace when smelting metal.

X Q. I take it, that in your opinion that is not crude?—A. No.

X Q. What are skimmings?—A. It is the same as dross, practically.

X Q. Is that crude or not?—A. That is secondary, it is not crude.

X Q. Is brass foundry ash a crude substance in your opinion?—A. No.

X Q. What is flue dust?—A. Flue dust is material that collects in the hops and flues, drops down to the hoppers, it is fine material like chimney sweep.

X Q. Is that crude?—A. That is secondary.

Upon the entire record we find that the imported merchandise at bar is a metallic mineral substance in a crude state, such as residues,

and is therefore properly classifiable under paragraph 1664 of the Tariff Act of 1930, as alleged by the plaintiff, rather than classifiable under paragraph 1634 of said act as old brass fit only for remanufacture, as classified by the collector. Therefore, the claim of the plaintiff is sustained, and the merchandise is held not to be subject to any tax under said section 601 (c) (7) of the Revenue Act of 1932.

Judgment will be rendered accordingly.